# UNITED STATES DISTRICT COURT

for the

Western District of Washington



CERTIFIED TRUE COPY
ATTEST: WILLIAM M. MCCOOL
Clerk, U.S. District Court
Western District of Washington

By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Subject Locations, more fully described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No.    MJ20-736

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Subject Locations, more fully described in Attachment A, incorporated herein by reference.

located in the          Western          District of          Washington          , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C | |

The application is based on these facts:

✓  See Affidavit of Special Agent Matt Eidinger, continued on the attached sheet.

☐ Delayed notice of          days (give exact ending date if more than 30 days: _____   is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Matt Eidinger*

*Applicant's signature*

Matt Eidinger, Special Agent

*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:          11/13/2020

*Judge's signature*

City and state:  Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge

*Printed name and title*

ATTACHMENT A

Person, Premises, and Vehicles to be Searched

a.  The person of Jorge Duran Aguilar, born in ████████ 1978.

b.  201 Mt Park Blvd SW, Apartment C202, Issaquah, Washington (Vista Ridge
Apartments).  This unit is in Building "C" within the complex.  The apartment door is
red with the number 202 on the door near the top.






Attachment A
Page 1

c.  A black 2011 Jeep Wrangler, bearing Washington license plate BRH7002; and,

d.  A white 2010 Acura RDX, bearing Washington license plate BTW8695.

ATTACHMENT B

Items to be Searched For, Seized, and Examined

The items to be searched for, seized, and examined, are those items on the person, premises and vehicles described in Attachment A (**Subject Locations**) that contain evidence, contraband, fruits, and instrumentalities of violations of Title 21, U.S.C., Sections 841(a)(1) and 846 - *Possession with the Intent to Distribute Controlled Substances, Conspiracy to Distribute Controlled Substances*, *Distribution of a Controlled Substance Resulting in Death;* Title 21, U.S.C., Section 856 – *Maintaining Drug-Involved Premises*; Title 21, U.S.C., Section 843(b) - *Use of a Communication Facility to Distribute Controlled Substances;* Title 18 U.S.C. Section 924(c) - *Possession of a Firearm in Furtherance of a Drug Trafficking Crime;* and, Title 18, United States Code, Section 1956 – *Money Laundering*.

1.　　**Controlled Substances**:  Including but not limited to cocaine, methamphetamine and fentanyl.

2.　　**Drug Paraphernalia**:  Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3.　　**Drug Transaction Records**:  Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, including such records stored in electronic format.

4.　　**Customer and Supplier Information**:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items, including such records stored in electronic format.

5.　　**Cash and Financial Records**:  Currency and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, including such records stored in electronic format; and money counters.

6.     **Photographs/Surveillance**:  Photographs, video tapes, digital cameras, surveillance cameras, and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances or other contraband, weapons, and assets derived from the distribution of controlled substances, including such records stored in electronic format.

7.     **Weapons**:  Firearms, magazines, ammunition, and body armor, and other weapons-related items such as holsters and equipment to clean firearms.

8.     **Codes**:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

9.     **Property Records**:  Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other property owned or rented.

10.     **Indicia of occupancy**, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents.

11.     **Evidence of Storage Unit Rental or Access**:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords, or other documents relating to storage units.

12.     **Evidence of Personal Property Ownership**:  Registration information, ownership documents, or other evidence of ownership of personal property including, but not limited to, vehicles, vessels, boats, airplanes, jet skis, all-terrain vehicles, RVs, and other personal property; evidence of international or domestic travel, hotel/motel stays; and any other evidence of unexplained wealth.

13.     **Individual and business financial books**, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:
   a.     Employment records:  paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.
   b.     Savings accounts:  statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

Attachment B
Page 2

  c. Checking accounts:  statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

  d. Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

  e. Collection accounts:  statements and other records.

  f. Certificates of deposit:  applications, purchase documents, and statements of accounts.

  g. Credit card accounts:  credit cards, monthly statements, and receipts of use.

  h. Receipts and records related to gambling wins and losses, or any other contest winnings.

  i. Insurance:  policies, statements, bills, and claim-related documents.

  j. Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

14. All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

15. All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash. These documents are to include applications, payment records, money orders, frequent customer cards, etc.

16. Negotiable instruments, jewelry, precious metals, financial instruments, and other negotiable instruments.

17. Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

18. Correspondence, papers, records, and any other items showing employment or lack of employment.

19. Telephone books, and/or address books, facsimile machines to include the other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records and bills relating to co-conspirators, sources of supply, customers, financial institutions, and

Attachment B
Page 3

other individuals or businesses with whom a financial relationship exists. Also, telephone
answering devices that record telephone conversations and the tapes therein for messages left
for or by co-conspirators for the delivery or purchase of controlled substances or laundering
of drug proceeds.

20.     Safes and locked storage containers, and the contents thereof that are otherwise
described in this document.

21.     Tools:  Tools that may be used to open hidden compartments in vehicles, paint,
bonding agents, magnets, or other items that may be used to open/close or conceal said
compartments.

22.     Cell Phones: Cellular telephones and other communications devices including
smartphones (i.e., iPhones, Android phones, Blackberries, and the like) may be seized, and
searched for the following items:

      a.     Assigned number and identifying telephone serial number (ESN,
MIN, IMSI, or IMEI);

      b.     Stored list of recent received, sent, and missed calls;

      c.     Stored contact information;

      d.     Stored photographs (including photographs stored within apps such as
Facebook, Instagram, or other social media or photographic apps) of narcotics,
currency, firearms, or other weapons, evidence of suspected criminal activity, and/or
the user of the phone or suspected co-conspirators, including any embedded GPS data
associated with those photographs;

      e.     Stored text messages, as well as any messages in any internet messaging
apps, including but not limited to Facebook Messenger, iMessage, Wikr, Telegram,
Signal, WhatsApp, and similar messaging applications that relate in any way to the
crimes set forth above.

ATTACHMENT C

The search is related to violations of the following offenses:

Title 21, U.S.C., Sections 841(a)(1) and 846 - *Possession with the Intent to Distribute Controlled Substances, Conspiracy to Distribute Controlled Substances*, *Distribution of a Controlled Substance Resulting in Death;* Title 21, U.S.C., Section 856 – *Maintaining Drug-Involved Premises*; Title 21, U.S.C., Section 843(b) - *Use of a Communication Facility to Distribute Controlled Substances;* Title 18 U.S.C. Section 924(c) - *Possession of a Firearm in Furtherance of a Drug Trafficking Crime;* and, Title 18, United States Code, Section 1956 – *Money Laundering*.

**AFFIDAVIT**

County of King                )
                              )
State of Washington           )

Matt Eidinger, being first duly sworn on oath, deposes and says:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with ICE/HSI since September 2008. I am presently assigned to a narcotics investigations group in Seattle, Washington focusing on narcotics trafficking and money laundering in the Western District of Washington. From March 2009 through June 2013, I was assigned to the Homeland Security Investigations (HSI) office in Blaine, Washington where I conducted narcotics and money laundering investigations on the Northwest Border. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I personally participated in drug trafficking investigations and work closely with other agencies, including the Drug Enforcement Administration (DEA).

2.      As a federal law enforcement officer for over eleven years, I have received formal training, as well as extensive on the job training, relative to the investigation of narcotics trafficking, money laundering, bulk cash smuggling, black market peso exchange, transportation, layering, structuring and other techniques used to launder illicit proceeds. I have participated in investigations which involved the use of electronic surveillance techniques and have been involved in multiple federal wiretap investigations. I have monitored or overheard numerous calls or meetings between informants or undercover agents, drug traffickers and money launderers. I have investigated offenses involving illicit controlled substances, money laundering, bulk cash smuggling, and other crimes that have resulted in arrests, indictments, and convictions.

AFFIDAVIT OF EIDINGER - 1
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  While participating in these and other criminal investigations, I have executed search

2  warrants at businesses, residences, vehicles and storage facilities. As a result of these

3  investigations, I have become familiar with methods and techniques used by narcotics

4  traffickers to import narcotics into the United States and distribute those narcotics within

5  the United States, and the methods and techniques used by money launderers and

6  narcotics traffickers to derive, launder, and conceal illicit proceeds, and to use these

7  proceeds to promote and facilitate unlawful activity. I have also participated in

8  undercover operations that involved the collection, transportation, exportation and

9  laundering of illicit proceeds derived from the sale of narcotics and other items.

10       3.      I have participated in investigations which involved money launderers and

11  drug traffickers using telephone communication as a means of communicating with their

12  associates, confidential informants, cooperating individuals and undercover officers. I

13  have interviewed individuals who have been directly and indirectly involved in amassing,

14  spending, converting, transporting, distributing, laundering, and concealing proceeds of

15  narcotics trafficking. I have also worked and consulted with numerous law enforcement

16  officers experienced in narcotics and money laundering investigations. As a result, I am

17  familiar with how money launderers and drug traffickers speak to each other and

18  generally conduct business. For example, I am aware that money launderers and drug

19  traffickers discussing criminal matters over the phone and often speak in code or in vague

20  terms. I am also aware these subjects frequently (1) provide false subscriber information

21  to the service providers; (2) use phones which are subscribed to under identities other

22  than their own; and (3) change phones in order to avoid detection by law enforcement.

23  This training and experience form the basis for my opinions expressed below. All dates

24  and times listed below are approximate unless otherwise noted.

25                          **PURPOSE OF THE AFFIDAVIT**

26       4.      This affidavit is submitted for the limited purpose of establishing probable

27  cause to search the locations listed below, more particularly described in Attachment A

28  hereto (collectively, the "subject locations"), for evidence of the crimes of Distribution of

AFFIDAVIT OF EIDINGER - 2
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Controlled Substances, Possession of Controlled Substances with Intent to Distribute, and

2 conspiracy to commit those offenses, in violation of Title 21, United States Code,

3 Sections 841(a)(1) and 846, together with related offenses, all as described in Attachment

4 B: hereto:

5         a.    The person of Jorge Duran Aguilar, born in ███████ 1978.

6         b.    201 Mt Park Blvd SW, Apartment C202, Issaquah, Washington

7 (Vista Ridge Apartments) (hereafter, **"Duran's Issaquah Address"**). The apartment

8 door is red with the number 202 on the door near the top.

9         c.    A black 2011 Jeep Wrangler, bearing Washington license plate

10 BRH7002 (hereafter, the **"black Jeep"**).

11         d.    A white 2010 Acura RDX, bearing Washington license plate

12 BTW8695 (hereafter, the **"white Acura"**).

13      5.    The facts in this affidavit come from my personal observations, my training

14 and experience, and information obtained from other agents and witnesses. I have not

15 included every fact concerning this investigation. Rather, I have set forth the facts that I

16 believe are necessary for a fair determination of probable cause.

17                  **SUMMARY OF PROBABLE CAUSE**

18      6.    This is an investigation of the Duran Drug Trafficking Organization (DTO).

19 The investigation has included the use of informants, controlled buys of drugs and

20 seizures of drugs.

21      7.    During the investigation, Jorge Duran Aguilar was identified as a multiple

22 kilogram supplier of cocaine in Western Washington area. His residence was identified

23 as 201 Mt Park Blvd SW, Apartment C202, Issaquah, Washington.

24      8.    Jorge D. Aguilar was born ███████ 1978. He has a gross

25 misdemeanor conviction for Driving under the Influence. The date of that offense was

26 October 17, 2019. On the same date, Immigration and Customs Enforcement (ICE),

27 Enforcement and Removal Operations (ERO) encountered Jorge Aguilar at the King

28 County Jail in Seattle, Washington. An ERO Deportation Officer interviewed Aguilar

AFFIDAVIT OF EIDINGER - 3
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | and determined he was a citizen of Mexico with no legal immigration status authorizing
2 | Aguilar to remain in the United States. ERO issued an immigration detainer for Aguilar
3 | to the King County Jail, which is operated by the King County Sheriff's Office (KCSO).
4 | However, the KCSO released Aguilar on October 18, 2019 without notifying ERO of his
5 | release.

### The Confidential Source – Background on Duran

7 |      9.     During the investigation described below, agents used the assistance of a
8 | confidential source referred to as Confidential Source 1. Confidential Source 1 (CS1) is
9 | providing information and assistance to both the DEA and HSI in exchange for monetary
10 | compensation and immigration benefits. CS1 has been providing this type of information
11 | to law enforcement since January 2019. To date, much of what CS1 reported has been
12 | independently corroborated through additional confidential sources and/or investigations.
13 | Other claims were unknown to investigators, but later, independently corroborated. CS1's
14 | criminal history includes:

15 |      2012 – Conspiracy to Distribute Controlled Substance (Cocaine) – Guilty,
16 |           sentenced to 20 months in prison, 48-month supervised release.

17 |      2004 – Assault 4/DV – dismissed, pled guilty to Reckless Endangerment.

18 |      10.    CS1 has demonstrated familiarity with various types of narcotics, their
19 | appearance, uses, prices as well as common smuggling methods. Since February 2019,
20 | CS1 provided information on a regular basis to the DEA. At the direction of DEA agents,
21 | CS1 performed controlled drug purchases on several occasions and provided credible and
22 | reliable information regarding drug traffickers in different matters.

23 |      11.    In November 2019, investigators met with CS1 who provided information
24 | to investigators on a multi-kilogram cocaine and methamphetamine distributor known to
25 | CS1 as "Duran." CS1 stated that Duran resides in the Issaquah, WA area and that he
26 | would sell CS1 cocaine or crystal methamphetamine.

27 |      12.    CS1 provided investigators with phone number 206-423-3205 (TT-1) for
28 | "Duran". CS1 had been provided this number by another suspected drug trafficker.

AFFIDAVIT OF EIDINGER - 4
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13.     During the same month, at my request, CS1 contacted DURAN about purchasing some cocaine or crystal methamphetamine. They communicated using text messages and phone calls over TT1. Although in Spanish, these communications were recorded and preserved for future evidentiary value. DURAN agreed to sell CS1 some cocaine and provided the phone number of his drug courier (runner). CS1 was provided with phone number 206-712-3146 for DURAN's courier. On November 19, 2019, at my request, CS1 contacted the courier at the provided number and scheduled the drug purchase for the following day.

14.     Also on November 19, 2019, a subpoena was issued to AT&T for subscriber information and tolls on TT-1. According to AT&T records, TT-1 is subscribed to by "Jorge Duran" at an address of 6150 E Lake Sammamish Pkwy SE, Issaquah, WA. DURAN has used TT-1 with AT&T since February 6, 2018. Database checks show that Jorge DURAN Aguilar maintains a Washington driver's license as Jorge Aguilar Duran with an address of 201 Mt Park Blvd SW Apt C-202, Issaquah, Washington (**Duran's Issaquah Address**).

### First Controlled Buy on November 20, 2019 – from Duran's Runner

15.     On November 20, 2019, at approximately 6:00pm, surveillance was established in the vicinity of the Home Depot located at 6200 E Lake Sammamish Pkwy., Issaquah, WA. Surveillance was established in anticipation of a cocaine transaction between a Confidential Source (hereinafter CS) and Duran's runner.

16.     Simultaneously, Special Agent (S/A) McCarthy and I met with the CS at a public place in Issaquah. We inspected the CS's person and vehicle for any contraband and currency. The inspection produced negative results for contraband.  However, CS1 had $9 in U.S. currency on their person. This was temporarily secured in my government operated vehicle (GOV). We attempted to install a recording device within CS1's vehicle but were unsuccessful in getting it to function properly.  Therefore CS1 audio recorded the brief transaction on their cellphone. We briefed the CS on the mission's objectives. The CS was then given $400 pre-recorded DEA funds to use for the purchase of the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  cocaine. In the hours and days prior to the planned transaction, the CS and Aguilar

2  communicated several times over the phone. These conversations established the plan for

3  the meeting, including the date, time, location and price for the narcotics.

4        17.    Shortly thereafter, the CS, S/A McCarthy and I convoyed over to the Home

5  Depot in Issaquah. S/A McCarthy and I observed the CS park in the Key Bank parking

6  lot, adjacent to Home Depot. At approximately 6:15pm, a man later identified as Luis

7  Abraham Neri Ibanez arrived in the Key Bank parking lot driving a Honda Accord

8  bearing Washington license plate BQF9427. Neri Ibanez parked next to the CS's vehicle

9  and exited the Honda. Neri Ibanez was observed wearing a red t-shirt and baseball cap as

10  he entered the CS's vehicle on the front-side passenger door. Approximately 5 minutes

11  later, Neri Ibanez exited the CS's vehicle and re-entered the Honda's driver seat. The

12  Honda departed immediately thereafter.  The CS's conversation with the runner, Neri

13  Ibanez, was recorded.

14        18.    Upon completion of the meeting, S/A McCarthy and I along with the CS

15  convoyed to a public place within Issaquah. The CS turned over a small clear plastic

16  baggie containing a small amount of a white chunky rock-like substance that field tested

17  positive for cocaine. The CS's person and vehicle were again searched for contraband

18  and currency; again, the results were negative.

19        19.    At approximately 6:30pm, Neri Ibanez entered the nearby Black Duck pub

20  through a side entrance. This was observed by S/A Ryan. Surveillance was terminated at

21  7:00pm. However, at approximately 7:30pm, I observed Neri Ibanez accessing the

22  Honda. The Honda was parked in a lot adjacent to the pub and I had been parked near the

23  target vehicle while conducting a phone call. Neri Ibanez was observed smoking a

24  cigarette and wearing the same red t-shirt and baseball cap. Neri Ibanez re-entered the

25  pub a few minutes later.

26        20.    The following day, HSI Analyst Wittnebel and I met with the CS to discuss

27  the acquisition of drug evidence. Utilizing a photo obtained from the Washington State

28  Department of Licensing, the CS positively identified Luis Neri Ibanez as the young

AFFIDAVIT OF EIDINGER - 6
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Hispanic male who sold him/her the cocaine sample. The CS confirmed Neri Ibanez had

2   been wearing a red shirt and baseball cap when he entered the CS's vehicle.

3          21.    On November 21, 2019, at my request, the CS called the person who had

4   referred the CS to Duran, and asked him if Neri Ibanez was a drug courier for Duran.

5   This person confirmed that Neri Ibanez was a drug courier for Duran.

6          **December 2019 Surveillance at Duran's Issaquah Residence**

7          22.    On December 12, 2019, at approximately 3:30pm, I established

8   surveillance near 201 Mt Park Blvd SW Apt C-202 Issaquah, WA. I observed a black

9   Jeep Wrangler bearing Washington plate BRH7002 parked in a reserved spot near the C

10  building. According to the Washington DOL, the above plate is registered to "Jorge

11  Aguilar Duran" at the above address. At approximately 3:40pm, I observed the Jeep

12  depart the apartment complex and began traveling towards downtown Issaquah. Ten

13  minutes later the Jeep was observed pulling into the parking lot adjacent to Max's World

14  Café located at 212 Front St N. The Jeep parked behind the back entrance to the café.

15  Surveillance was terminated.

16         **Second Controlled Buy – December 13, 2019 – from Duran's Runner**

17         23.    On December 13, 2019, agents with DEA and HSI conducted a successful

18  buy/walk operation with follow on surveillance in Issaquah. In the hours and days prior

19  to the transaction, the CS and Neri Ibanez communicated through text message to

20  establish a plan and discuss pricing. Although in Spanish, these messages have been

21  preserved for future evidentiary value. Crystal methamphetamine was purchased from

22  Neri Ibanez in the Gilman Village parking lot adjacent to the Black Duck pub. Prior to

23  the transaction, investigators searched CS1 and his/her vehicle for contraband or

24  currency, with negative results. After conducting the search and providing the CS with

25  official government funds to conduct the transaction, investigators kept the CS under

26  surveillance.

27         24.    The transaction took place at approximately 12:15pm inside CS1's vehicle.

28  The transaction lasted approximately 10 minutes before Ibanez was seen to exit CS1's

1 vehicle and return to the Black Duck pub. The CS departed the area and surveillance
2 personnel remained in the area. This meeting was audio recorded and preserved for future
3 evidentiary value.

4       25.    At approximately 1:15pm, I established surveillance outside of Max's
5 World Café in Issaquah. I ordered takeout from Max's shortly thereafter. When I went
6 inside to pay, I observed a light-skinned, heavy-set Hispanic male cooking in the kitchen.
7 Based on a photo from a Washington State driver's license, I confirmed the cook working
8 at Max's was Jorge DURAN Aguilar. I observed DURAN depart the café at
9 approximately 2:30pm. At approximately 3:00pm, I observed DURAN driving his black
10 Jeep traveling westbound on W Sunset Way. DURAN had picked up a front passenger
11 somewhere nearby. The front passenger appeared to be another light-skinned heavy-set
12 Hispanic male. Surveillance was terminated at approximately 3:30pm.

13       26.    Agents had maintained surveillance on CS1 after the controlled purchase
14 and met with him/her at a nearby location. CS1 provided agents with the purchased
15 methamphetamine and searched his/her person for contraband and currency with negative
16 results. Agents then conducted a quick debrief of CS1. According to CS1, Neri Ibanez
17 was carrying a couple of blue latex gloves in his hand. Upon sitting inside the CS's
18 vehicle, Ibanez removed from one glove what looked like an aluminum foil "ball" and
19 handed it to CS1. CS1 peeled the ball open exposing clear Saran wrap containing a small
20 amount of semi-clear/white shards which ultimately field tested positive for the chemical
21 properties of methamphetamine. Neri Ibanez was paid in cash after CS1 observed what
22 appeared to be crystal methamphetamine.

23       27.    CS1 confirmed the "runner's" name was Luis [Neri Ibanez] and that Luis
24 was working at the direction of [Jorge] "DURAN" [Aguilar]. Luis confirmed he was an
25 illegal alien present in the United States from Michoacán, Mexico. CS1 confirmed
26 DURAN was not selling heroin, and that only cocaine and crystal methamphetamine
27 were available for purchase. Neri Ibanez told CS1 that bulk purchases of either substance
28 was available to paying customers. CS1 inquired about meeting DURAN in person. Neri

AFFIDAVIT OF EIDINGER - 8
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | Ibanez told CS1 that could happen only during a larger bulk drug purchase. Neri Ibanez
2 | complained to CS1 about purchasing small amounts of drugs.

3 |       28.    CS1 stated Neri Ibanez claimed to be in possession of 2 more ounces of
4 | crystal methamphetamine at that moment. Also, according to CS1, Neri Ibanez said
5 | DURAN would be coming by the restaurant shortly to pick up the money from the drug
6 | sale. Neri Ibanez told CS1 he worked for two restaurants within Issaquah. He worked for
7 | the Black Duck Cask & Bottle pub as well as the Flat Iron Grill. These restaurants are
8 | located next to one another within Gilman Village.

9 | **January 29, 2020 – Meeting between CS and Duran to Discuss Future Drug**
10 | **Transactions**

11 |       29.    On January 29, 2020, agents with HSI Seattle established a stationary
12 | surveillance around Las Margaritas Mexican Restaurant at 59 Front Street N, Issaquah,
13 | Washington. The purpose of the surveillance was to observe a meeting between the CS
14 | and Jorge Duran Aguilar. The purpose of this meeting was to discuss future drug
15 | transactions between the two parties.  In the hours and days prior to the transaction, the
16 | CS and DURAN communicated through text message (TT-1) to establish a plan.
17 | Although in Spanish, these messages have been preserved for future evidentiary value.

18 |       30.    At approximately 2:30 PM, the CS parked his/her car in the back-parking
19 | lot of Las Margaritas. The parking lot is behind Las Margaritas and can be accessed from
20 | 1st Place NW. One minute later, Duran arrived driving his black Jeep Wrangler bearing
21 | Washington license plate BRH7002. S/A Ryan observed the Jeep parking near the CS's
22 | vehicle. He also observed Duran exit the Jeep's driver's seat and walk over to the CS's
23 | vehicle. Duran entered the CS's vehicle as a front passenger.

24 |       31.    At approximately 2:45 PM, S/A Ryan observed Duran exit the CS's vehicle
25 | and return to his Jeep parked nearby. Both parties departed the parking lot a minute later.
26 | Duran went northbound on 1st Pl NW. Surveillance units followed Duran to Dickey's
27 | Barbecue Pit located at 710 NW Gilman Blvd Ste D-105 in Issaquah. Duran did not enter
28 | the restaurant but parked near the front entrance. S/A's Winger and Sawyer observed an

AFFIDAVIT OF EIDINGER - 9
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    obese unknown Hispanic male (UHM) get into Duran's Jeep on the passenger side. Duran

2    and the UHM talked inside the Jeep for approximately ten minutes. Afterwards, the UHM

3    exited the vehicle and walked into Dickey's. S/A Winger observed the UHM working in

4    the kitchen at Dickey's.

5        32.    S/A Sawyer observed Duran heading north on Gilman Boulevard after the

6    UHM exited his vehicle. Approximately ten minutes after the meeting concluded, DEA

7    S/A Morales observed Duran's Jeep parked in front of building C at the Vista Ridge

8    Apartments. According to the Washington State Department of Licensing, Jorge Duran

9    Aguilar resides at 201 Mt Park Blvd SW, Apt. C-202 in Issaquah (**Duran's Issaquah**

10   **Address)**.

11       33.    At the conclusion of the meeting, I debriefed the CS at a public place in

12   Issaquah. According to the CS, Duran said he can obtain bulk quantities of cocaine;

13   crystal methamphetamine; heroin and M30's (fentanyl-laced). Duran told the CS he

14   stopped selling crystal meth back in December because one of his Issaquah customers

15   (male) fatally overdosed on a "bad batch" of Duran's meth. Duran claims the police

16   almost caught him. Duran told the CS he used to sell oxycodone but hadn't recently and

17   that he could obtain firearms if asked to. Duran alluded to having a "firearms guy" and a

18   "pill guy". Duran told the CS he would have a price on the pills and crystal meth

19   tomorrow (01/30/2020).

### February 19, 2020 – Third Controlled Buy – From Duran Directly

21       34.    On February 19, 2020, at approximately 4:00pm, surveillance was

22   established in the vicinity of Home Depot located at 6200 E Lake Sammamish Pkwy,

23   Issaquah. Surveillance was established in anticipation of a transaction involving one

24   ounce of cocaine between the CS and Jorge Duran Aguilar. Simultaneously, DEA S/A

25   Morales and I met with the CS at a public place in Issaquah. We inspected the CS' person

26   and vehicle for any contraband and currency. The inspection produced negative results.

27   We briefed the CS on the mission's objectives. The CS was then given $1200 in DEA

28   operational funds to use for the purchase of the cocaine. In the hours and days prior to the

AFFIDAVIT OF EIDINGER - 10
USAO # 2020R00318

1  planned transaction, the CS and Duran texted and talked several times over the phone.

2  These conversations established the plan for the upcoming meeting, including the date,

3  time, location and price for the product. This meeting was audio recorded.

4          35.     Shortly thereafter, the CS received a text message from Duran at 206-423-

5  3205. Duran told the CS he/she would be meeting "Pelon" at his (Duran's) apartment

6  complex, in the parking lot. Duran provided Pelon's phone number as 206-380-5861 and

7  said he was driving a white Chevrolet Silverado truck. Duran provided Pelon's address as

8  201 Mt Park Blvd SW E-306; Vista Ridge Apartments in Issaquah. At approximately

9  5:30pm, S/A Morales observed the CS park in the Vista Ridge parking lot near building

10  E. Previously, DEA TFO Huntington observed an UHM [later identified as Pelon]

11  hanging around a white Chevrolet Silverado with tinted windows parked in the apartment

12  complex. The truck was bearing Washington license plate C49472B. According to the

13  Washington State Department of Licensing, this plate is registered to a Modesto Rubio

14  Madera at 31003 150TH AVE SE in Kent. Pelon was seen wearing a white hoodie and

15  plaid shorts. The CS entered Pelon's truck. A few minutes later the CS exited the truck

16  and retrieved a small digital scale from his/her car parked nearby. The CS reentered

17  Pelon's truck. Approximately 10 minutes later, the CS exited the truck and walked back

18  to his/her car parked nearby. Due to lack of daylight and positioning, surveillance units

19  were unable to see if Pelon exited his truck and walked towards a specific apartment. The

20  truck remained parked in the same spot, with no further activity observed, until

21  surveillance was terminated at 6:30pm.

22          36.     Upon completion of the meeting, the CS, S/A Morales and I convoyed to a

23  public place within Issaquah. The CS turned over 2 bindles of a white powdery substance

24  contained in clear Saran wrap. The bindles had been concealed within an empty cracker

25  box. The CS' person and vehicle were again searched for contraband and currency; again,

26  the results were negative. The CS stated once inside Pelon's truck, he (Pelon) removed a

27  small cracker box from the truck's center console. The open box was stuffed with a piece

28  of brown wrapping paper. The CS removed the piece of paper and observed 2 "white

AFFIDAVIT OF EIDINGER - 11
USAO # 2020R00318

1   balls" wrapped in clear plastic. The CS told Pelon he/she was going to grab their scale

2   and weigh it since Duran had shorted him/her before on actual drug weight. The CS

3   retrieved his/her digital scale from his/her vehicle then got back inside Pelon's truck. The

4   CS weighed the 2 "balls" together in front of Pelon. According to the CS, the product

5   weighed approximately 1.1 ounces.

6       37.     Pelon told the CS he lives in this (201 Mt Park Blvd) apartment complex

7   and gestured at building "E." Pelon told the CS Duran is his actual cousin and that they

8   "do business" together. Pelon told the CS he could get cocaine, crystal

9   methamphetamine, and counterfeit M30 pills. Pelon told the CS to continue contacting

10   Duran first before any future drug transactions.

11               **April 29, 2020 – Fourth Controlled Buy from Duran**

12       38.     On April 29, 2020, at approximately 1:15 PM, surveillance was established

13   in the vicinity of the Issaquah Home Depot located at 6200 E Lake Sammamish Pkwy.

14   Surveillance was established in anticipation of a transaction involving 2 ounces of

15   cocaine between the CS and Duran. Simultaneously, S/A Morales and I met with the CS

16   at a public place in Issaquah. We inspected the CS's person and vehicle for any

17   contraband and currency. The inspection produced negative contraband results. The CS

18   had $25 in U.S. currency on their person. I temporarily secured the CS's money in my

19   shirt pocket. We briefed the CS on the mission's objectives. The CS was then given

20   $2400 in DEA operational funds to use for the purchase of the cocaine. In the hours and

21   days prior to the planned transaction, the CS and Duran texted and talked several times

22   over the phone. These conversations established the plan for the upcoming meeting,

23   including the date, time, location and price for the product. This meeting was audio

24   recorded.

25       39.     Shortly thereafter, the CS placed a call to Duran at 206-423-3205. The CS

26   told Duran he/she was in Issaquah and for Duran to come meet him/her in the Home

27   Depot parking lot. The CS, S/A Morales and I convoyed over to the Issaquah Home

28   Depot. The CS and S/A Morales both parked in the Key Bank section of the lot. At

AFFIDAVIT OF EIDINGER - 12
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  approximately 1:30 PM, S/A Morales and I observed a white Honda Accord drive into
2  the lot and park near the CS. S/A Morales observed the CS exit his/her vehicle and get
3  into the front passenger seat of the Accord. The CS could be seen carrying the white
4  envelope with the $2400 into the Honda. The Honda was bearing Washington license
5  plate BRW2432. According to the Department of Licensing, this plate is registered to a
6  2007 Honda Accord owned by Javier Duran Aguilar at 360 NW Dogwood St, #G201,
7  Issaquah. The CS was inside the Honda for approximately 10 minutes before exiting and
8  returning to his/her nearby vehicle. Upon completion of the meeting, the CS, S/A
9  Morales and I convoyed to a public place within Issaquah away from Home Depot. The
10  CS turned over 4 bindles of a white powdery substance contained in clear Saran wrap.
11  The bindles had been concealed within an empty Chips Ahoy cookie box. The CS' person
12  and vehicle were again searched for contraband and currency; again, the results were
13  negative. I returned the CS's cash to him/her.

14     40.    Upon completion of the meeting, surveillance units followed the Honda to
15  the Costco gas pumps located at 1801 10th Ave NW in Issaquah. TFO Raney observed
16  Duran exit the driver's seat and commence filling his gas tank. After completing his fuel
17  purchase, surveillance units followed Duran to the Fred Meyer parking lot adjacent to the
18  previously departed Home Depot. After sitting in his car for approximately 30 minutes, a
19  woman believed to be Duran's wife and child exited the Fred Meyer with a cart full of
20  merchandise. The wife loaded the car and returned the cart. The wife and child entered
21  the Honda and departed the parking lot with Duran driving. This was again observed by
22  TFO Raney. Surveillance units followed Duran from the Fred Meyer parking lot to his
23  apartment complex located at 201 Mt Park Blvd in Issaquah (**Duran's Issaquah**
24  **Address)**. Surveillance was terminated at this time.

25     41.    According to the CS, during the transaction, Duran was the only occupant
26  inside the vehicle. The CS observed Duran pull a Chips Ahoy package from underneath
27  the driver's seat and hand it to him/her. The CS opened the blue wrapping exposing the
28  empty clear plastic tray normally filled with cookies. There were 5 bindles of a white

1  crystalline substance each wrapped in clear Saran wrap. Duran attempted to sell the CS
2  an additional ounce of cocaine. The CS declined so Duran removed 1 of the bindles and
3  placed it back in his center console. Duran and the CS began discussing various topics
4  involving narcotics. Duran told the CS he was running low on cocaine and that he had to
5  make the trip to Orange County, California to obtain a resupply. Duran asked the CS if
6  he/she had any special requests from his supplier. The CS requested both counterfeit
7  oxycodone pills with fentanyl and crystal methamphetamine. Duran said he couldn't
8  obtain the pills but would attempt to get the crystal meth. Duran told the CS he had to
9  make the trip this time because his cousin, Pelon, made the last one. Pelon was previously
10  identified as Modesto Rubio Madera. The CS asked Duran why he wasn't driving his
11  black Jeep Wrangler. Duran told the CS that the Honda Accord was the vehicle used to
12  travel to/from California for drug resupplies.

13  **September 29, 2020 - Fifth Controlled Buy from Duran**

14  42.     On September 29, 2020, HSI agents established surveillance around the
15  Fred Meyer in Issaquah in anticipation of a buy/walk operation. Simultaneously, S/A
16  McPherson and I met the CS at a public place in Issaquah to brief him/her on the
17  mission's objectives. In addition, the CS's vehicle and person were searched for currency
18  and contraband. Neither was located. The CS was given HSI operational funds in the
19  amount of $2600. At approximately 5:40 PM, the CS arrived in the vicinity of 6100 E
20  Lake Sammamish Pkwy SE, Issaquah. Twenty minutes later Jorge Duran Aguilar arrived
21  at the Vista Ridge Apartments in Issaquah (**Duran's Issaquah Address**). He was driving
22  a white Acura RDX bearing Washington license plate BTW8695. Three people exited the
23  vehicle and headed towards the "C" building; Duran, a Hispanic female (*suspected wife*)
24  and a juvenile male (*suspected son*). Duran was observed wearing black pants and a blue
25  T-shirt. All of this was observed by S/A Hardin-Pineda. At approximately 6:03 PM,
26  Duran was observed exiting the "C" building, wearing the same clothes, and entering the
27  Acura. Duran departed the apartment complex parking lot.

28

AFFIDAVIT OF EIDINGER - 14
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

43.     Duran arrived at the Fred Meyer parking lot at approximately 6:15 PM. Duran exited the Acura and got into the front seat of the CS's vehicle. According to the Department of Licensing, the Acura is registered to Javier Duran Aguilar at 360 NW Dogwood St, Apt. G201, in Issaquah. Duran was in the CS's vehicle for less than 10 minutes. The conversation between the CS and Duran was audio recorded. In the hours and days prior to the planned transaction, the CS and Duran texted and talked (747-276-7419) several times over the phone. These conversations established the plan for the upcoming meeting, including the date, time, location and price for the product.

44.     At approximately 6:25 PM, Duran departed the Fred Meyer parking lot driving the Acura. Nearby agents conducted a mobile surveillance of Duran. He drove straight home to his apartment at the Vista Ridge complex. Again, S/A Hardin-Pineda observed the Acura park near building "C" and Duran exit the vehicle and head to his specific apartment building (**Duran's Issaquah Address**). Surveillance was terminated at approximately 6:35 PM.

45.     According to the CS, while conducting the transaction the CS and Duran discussed future narcotics transactions including the purchase of crystal methamphetamine. Duran told the CS he drives to Oregon to pick up the cocaine and that his cocaine supplier also has crystal meth available for purchase. Duran told the CS he would provide the price for crystal meth in a few days. Duran told the CS he was given a price break on bulk narcotics because he was driving to Oregon and bringing back a resupply for himself and a couple other drug traffickers in the Seattle area. Duran told the CS he kept 2 kilograms of cocaine for himself on this most recent drug run. Duran said he distributed 2 kilograms of cocaine each to 3 other recipients in the Seattle area.

46.     Upon completion, the CS, S/A McPherson and I convoyed to a public place within Issaquah in order to recover the evidence and conduct a quick field debrief. S/A McPherson witnessed me retrieving the evidence from the CS's car. We searched the CS's vehicle and person for any additional evidence. The searches yielded negative results.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  The operation concluded at approximately 6:45 PM. This operation was audio recorded.
2  The recording will be submitted as electronic evidence exhibit later.

3  <center>**Recent Surveillance at Duran's Issaquah Address**</center>

4  47.     On November 10, 2020, at approximately 7:45pm, I drove through the
5  Vista Ridge Apartments to look for any vehicles previously associated to Duran. I
6  observed the **black Jeep** and the **white Acura** parked in front of the "C" building in two
7  separate covered parking spots. In addition, in front of the C building, there was a red
8  Ford F-150 truck with a fake Washington license plate on the front bumper that read
9  "DURAN." According to the Washington DOL, this truck is a Collector Vehicle with
10  Washington license plate CV7907C (*attached to rear bumper*). This vehicle is registered
11  to "Jorge Duran" at 201 Mountain Park Blvd SW APT C-202 Issaquah, WA (**Duran's**
12  **Issaquah address**).

13  48.     Based on the above investigation, I believe Jorge Duran Aguilar is residing
14  at his **Issaquah Address** and using that location to store his drugs he distributes in the
15  local area.  I also believe that evidence of drug trafficking will be found at **Duran's**
16  **Issaquah Address** and in the vehicles set forth above.  Lastly, I believe that evidence of
17  these offenses will be found on Duran's person, including but not limited to cellular
18  telephones used to further his criminal activity.

19  <center>**KNOWLEDGE BASED ON TRAINING AND EXPERIENCE**</center>

20  49.     Based upon my training and experience, and my discussions with other
21  experienced officers and agents involved in drug investigations, I know the following:

22  a.     Traffickers of controlled substances, and those who assist them,
23  maintain and tend to retain accounts or records of their drug trafficking activities,
24  including lists of drug quantities and money owed, telephone records including contact
25  names and numbers, photographs, and similar records of evidentiary value.  These items
26  are generally kept in locations where drug traffickers believe their property is secure and
27  will remain undetected from law enforcement, such as inside their homes, vehicles,
28  storage units, and businesses.

AFFIDAVIT OF EIDINGER - 16
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          b.      Traffickers of controlled substances commonly maintain records
2   reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers,
3   customers and associates in the trafficking organization.  Traffickers commonly maintain
4   this information in books or papers as well as in their cellular telephones.  Traffickers
5   often maintain cellular telephones for ready access to their clientele and to maintain their
6   ongoing drug trafficking.  Traffickers often change their cellular telephone numbers to
7   avoid detection by law enforcement, and it is common for traffickers to use more than
8   one cellular telephone at any one time.

9          c.      Traffickers maintain evidence of their criminal activity at locations
10  that are convenient to them, including their residences, residences of family members or
11  other trusted associates, their vehicles, and storage lockers.  This evidence often includes
12  not only contraband and paraphernalia, but also financial records, older cellular
13  telephones, records of property and vehicle ownership, records of property rented, and
14  other documentary evidence relating to their crimes.  Drug traffickers sometimes take or
15  cause to be taken photographs and/or video recordings of themselves, their associates,
16  their property, and their illegal product.  These individuals often maintain these
17  photographs and recordings in their possession or at their premises.

18         d.      During the execution of search warrants, it is common to find
19  papers, letters, billings, documents, and other writings which show ownership, dominion,
20  and control of vehicles, residences, and/or storage units.

21         e.      Persons trafficking and using controlled substances commonly sell
22  or use more than one type of controlled substance at any one time.

23         f.      Traffickers frequently maintain items necessary for weighing,
24  packaging and cutting drugs for distribution.  This paraphernalia often includes, but is not
25  limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of
26  drugs.

27

28

AFFIDAVIT OF EIDINGER - 17
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          g.      It is common for drug dealers to also be users of their product, and

2   that it is common for the drug user to maintain paraphernalia associated with the use of

3   controlled substances.

4          h.      Traffickers frequently maintain records, books, notes, ledgers, travel

5   documents, and other papers relating to the transportation and distribution of controlled

6   substances, including travel records, in locations convenient to them, such as their

7   residences, residences of family members and trusted associates, and vehicles.

8          i.      Traffickers frequently keep on hand amounts of United States

9   currency in order to maintain and finance their ongoing narcotics business.  They

10  commonly deal in currency because of its untraceable nature.  They sometimes convert

11  their illicit currency into currency equivalents such as cashier's checks and money orders.

12  Traffickers often conceal in secure locations such as their residences and vehicles

13  currency, financial instruments, precious metals, jewelry, and other items of value which

14  are the proceeds of drug transactions and evidence of consequential financial

15  transactions, relating to obtaining, transferring, secreting, or spending large sums of

16  money made from engaging in drug trafficking activities, and financial books, records,

17  receipts, notes, ledgers, diaries, journals, and all records relating to income, profit,

18  expenditures, or losses, and other records showing the management of such assets.

19  Traffickers often have money counters.

20         j.      Traffickers often maintain weapons, including guns, ammunition,

21  and body armor, in secure locations such as their residences and vehicles, in order to

22  protect their drugs and drug proceeds.

23         k.      Traffickers often have false identification documents and

24  identification documents in the names of others in order to conceal their identities.

25         l.      Traffickers very often place assets in names other than their own, or

26  use fictitious names and identification, to avoid detection of these assets by government

27  agencies, and that even though these assets are in other persons names, the drug dealers

28

AFFIDAVIT OF EIDINGER - 18
USAO # 2020R00318

1  actually own and continue to use these assets and exercise dominion and control over
2  them.

3          m.     Illegal drug trafficking is a continuing activity over months and even
4  years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances
5  on a somewhat regular basis, much as any distributor of a legitimate commodity would
6  purchase stock for sale and, similarly, such drug traffickers will have an "inventory"
7  which will fluctuate in size depending upon various factors to include the demand and
8  supply for the product.  I would expect the trafficker to keep records of his illegal
9  activities for a period of time extending beyond the time during which he actually
10  possesses illegal controlled substances, in order that he can maintain contact with his
11  criminal associates for future drug transactions, and so that he can have records of prior
12  transactions for which, for example, he might still be owed money, or might owe
13  someone else money.  These records are often created in code.

14       50.    As noted above, drug dealers use cellular telephones as a tool or
15  instrumentality in committing their criminal activity.  They use them to maintain contact
16  with their suppliers, distributors, and customers.  They prefer cellular telephones because,
17  first, they can be purchased without the location and personal information that land lines
18  require.  Second, they can be easily carried to permit the user maximum flexibility in
19  meeting associates, avoiding police surveillance, and traveling to obtain or distribute
20  drugs.  Third, they can be passed between members of a drug conspiracy to allow
21  substitution when one member leaves the area temporarily.  Since cellular phone use
22  became widespread, every drug dealer I have contacted has used one or more cellular
23  telephones for his or her drug business.  I also know that it is common for drug traffickers
24  to retain in their possession phones that they previously used, but have discontinued
25  actively using, for their drug trafficking business.  Based on my training and experience,
26  the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or
27  crimes.  This includes the following:

28

AFFIDAVIT OF EIDINGER - 19
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.    The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source or was intercepted on a wiretap here or in another district.

b.    The stored list of recent received calls and sent calls is important evidence.  It identifies telephones recently in contact with the telephone user.  This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts.  If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting.  Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user.  Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c.    Stored text messages are important evidence, similar to stored numbers.  Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.    Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to

AFFIDAVIT OF EIDINGER - 20
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  be members of the drug trafficking organization.  Some drug dealers photograph groups
2  of associates, sometimes posing with weapons and showing identifiable gang signs.

3          e.      Stored address records are important evidence because they show the
4  user's close associates and family members, and they contain names and nicknames
5  connected to phone numbers that can be used to identify suspects.

6                              **CONCLUSION**

7          51.     For the foregoing reasons, I respectfully submit there is probable cause to
8  search the subject locations, more particularly described in Attachment A hereto, for the
9  evidence described in Attachment B hereto.

10         52.     I also respectfully submit there is good cause to keep this warrant
11  application and affidavit sealed.  This is an ongoing investigation into multiple associates
12  of the Duran DTO.  Premature revelation of the investigation will tend to have an adverse
13  impact on the ongoing investigation.  In particular, there is good cause to believe that
14  revealing the identity of the Confidential Sources involved will imperil both the sources
15  and the larger investigation.

16                          _Matt Eidinger_
17                          Matt Eidinger
18                          Special Agent
                            Homeland Security Investigations
19
20
21         The above-named agent provided a sworn statement to the truth of the foregoing
    affidavit by telephone on 13th day of November 2020.
22
23
24                          THE HONORABLE MARY ALICE THEILER
25                          United States Magistrate Judge
26
27
28

AFFIDAVIT OF EIDINGER - 21
USAO # 2020R00318

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970